UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KELLEY VALE-GUGLIUIZZI as personal representative of the ESTATE OF JOSHUA BELLAMY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-03432-JRS-DML |
| JOHN LAYTON in his official capacity as Sheriff of Marion County, JEJUAN WESTMORELAND in his individual and official capacities, CORRECT CARE SOLUTIONS LLC, JENNIFER DEESE in her individual and Official capacities, WILBERT GORDY in his individual and official capacities, FELICIA CLARK in her individual and official capacities, MCDANIELS Deputy, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**Order Granting Defendants' Motions for Summary Judgment
(ECF Nos. 115 & 118)**

Plaintiff Kelley Vale-Gugliuizzi, as personal representative of the Estate of Joshua Bellamy, brings claims against Defendants Marion County Sheriff John Layton, Deputy Jejuan Westmoreland, Deputy Wilbert Gordy, Deputy Felicia Clark, Deputy McDaniel (collectively, the "County Defendants") as well as the Marion County Jail's (the "Jail") medical provider Correct Care Solutions LLC ("CCS") and CCS Nurse Jennifer Deese (collectively, the "Medical Defendants"). (Am. Compl., ECF No. 36.)  Specifically, Vale-Gugliuizzi alleges that, while Bellamy was an inmate at the

Jail, Jail and CCS staff were deliberately indifferent to Bellamy's medical needs; Sheriff Layton's Jail policies failed to address inmates' serious medical needs and failed to properly train and supervise employees; and CCS's policies failed to prevent inmate suicides, all resulting in Bellamy's death.  All Defendants now move for summary judgment.  For the following reasons, the Medical Defendants motion (ECF No. 115) and the County Defendants' motion (ECF No. 118) are each **granted**

## I.   Background

### A.  CCS and Jail Policies

CCS has been the Jail's medical provider since January 1, 2010.  (Marshall Decl. ¶ 8, ECF No. 119-1.)  CCS maintains a Suicide Risk Reduction Program for the Jail. (*Id*.; CCS Suicide Risk Program, ECF No. 119-2.)  As a part of this program, CCS staff screen new inmates for their risk of committing suicide.  (Marshall Decl. ¶ 9, ECF No. 119-1.)  If a staff member identifies someone who is potentially suicidal, the inmate is placed on suicide watch and immediately referred to mental health staff. (CCS Suicide Risk Program, ECF No. 119-2 at 3.)

All jail personnel receive training on how to assist in identifying potentially suicidal inmates and to intervene to prevent attempted suicide and death by suicide. (Marshall Decl. ¶ 10, ECF No. 119-1; 7 Minutes to Save Campaign, ECF No. 119-9.) The Marion County Sheriff's Office ("MCSO") Jail Division Policies and Procedures requires initial and annual suicide prevention training for deputies.  (Marshall Decl. ¶ 10, ECF No. 119-1; MCSO Policy #JP1-15, ECF No. 119-9.)  First-year deputies are trained on supervision of inmates, signs of suicide risk, suicide precautions, safety

procedures, social/cultural lifestyles of the inmate population, and CPR/first aid. (MCSO Policy #JP1-15, ECF No. 119-9.)  Annual employee training includes instruction on suicide prevention, including for inmates, identification of mental health problems, appropriate intervention, and treatment.  (*Id*.)  All individual deputies named in this lawsuit have received this training.  (Westmoreland Dep. 8:16-25, 9:1-6, 12:18-25, ECF No. 119-3; Clark Dep. 22:1-20, ECF No. 119-4; Gordy Dep. 10:5-25, ECF No. 119-5; McDaniel Decl. ¶ 3, ECF No. 119-6.)

Deputies are also trained and required to conduct "clock rounds" at least every sixty minutes in general population areas.  (Marshall Decl. ¶ 11, ECF No. 119-1.)  A clock round is when two or more deputies enter a cell block and walk through to ensure the inmates are secure and that there is no contraband.  (Westmoreland Dep. 15:7-25, ECF No. 119-3; Gordy Dep. 22:1-14, ECF No. 119-5.)  Deputies must make visual contact and physically interact with each inmate.  (Marshall Dep. ¶ 11, ECF No. 119-1; MCSO Policy JP#2-23, ECF No. 119-7.)

MCSO maintains an Inmate Handbook, which contains prohibitions on self-harming behavior.  (Marshall Dep. ¶¶ 14-16, ECF No. 119-1; MCSO Inmate Handbook, ECF No. 119-18.)  Inmates are also instructed to seek medical help for mental health issues.  (*Id*.)

*B. Bellamy's Medical Screening and Treatment*

On September 24, 2016, Joshua Bellamy was arrested on a warrant and booked into the Marion County Jail (the "Jail").  (Am. Compl. ¶¶ 23 & 24, ECF No. 36; Bel-

lamy OMS Records, ECF No. 119-10.)  As a new inmate, Bellamy was medically ex-
amined by the Jail's medical contractor, CCS.  (Deese Aff. ¶¶ 2 & 3, ECF No. 116-2;
Bellamy Medical Records, ECF No. 116-4 at 2.)  Nurse Jennifer Deese performed Bel-
lamy's Receiving Screening, which evaluates an inmate's current and past medical
issues.  (Deese Aff. ¶ 3, ECF No. 116-2; Bellamy Medical Records, ECF No. 116-4 at
2.)  Bellamy reported he had received treatment for substance abuse at a rehabilita-
tion facility in July 2016.  (Bellamy Medical Records, ECF No. 116-4 at 2-3.)  He did
not report any other medical conditions.  (*Id*.)  Bellamy reported having used Xanax
and heroin daily and that he had used twice that day.  (*Id*.)  Bellamy also reported
that when he has stopped using Xanax and heroin in the past, he suffered from with-
drawal symptoms such as an upset stomach and stomach aches.  (*Id*. at 3.)  Nurse
Deese subsequently conducted a Suicide Potential Screening on Bellamy.  (Deese Aff.
¶ 3, ECF No. 116-2; Bellamy Medical Records, ECF no. 116-4 at 4-5.)  The Suicide
Potential Screening consists of eighteen questions designed to ascertain whether an
inmate is experiencing suicidal thoughts.  (Deese Aff. ¶ 3, ECF No. 116-2.)  Bellamy
answered "no" to each question, including whether he had any thoughts about killing
himself.  (*Id*.; Bellamy Medical Records, ECF No. 116-4 at 4-5.)

Nurse Deese also conducted a Psychiatric Screening on Bellamy, which assesses
an inmate's current and past psychiatric issues.  (Deese Aff. ¶ 3, ECF No. 116-2; Bel-
lamy Medical Records, ECF No. 116-4 at 5.)  Bellamy reported no past or current
psychiatric issues.  ((Deese Aff. ¶ 3, ECF No. 116-2; Bellamy Medical Records, ECF
No. 116-4 at 5.)  Lastly, Nurse Deese reported the following as to Bellamy's current

mental status: Orientation: Alert; Affect: Appropriate; Thought Process: Logical;
Speech: Appropriate; Mood: Appropriate; Activity/Behavior: Appropriate. (Bellamy
Medical Records, ECF No. 116-4 at 6.)

Because of Bellamy's reported use of Xanax and heroin, Nurse Deese referred him
to a medical provider and recommended a Clinical Institute Withdrawal Assessment
("CIWA") protocol, which treats inmates for Benzodiazepine and alcohol withdrawal.
(*Id*.; Deese Aff. ¶ 4, ECF No. 116-2.) Nurse Deese also recommended Bellamy be
placed on a bottom bunk. (Bellamy Medical Records, 116-4 at 6.) Dr. John Foster
ordered CIWA and Clinical Opiate Withdrawal Scale ("COWS") (treatment for opiate
withdrawal) protocols for Bellamy's Xanax and heroin withdrawals. (Bellamy Medi-
cal Records, ECF No. 116-4 at 12.) Dr. Foster also ordered Meclizine (Antivert), Ac-
etaminophen (Tylenol), Imodium (Loperamide), and Librium (Chlordiazepoxide) to
treat Bellamy's withdrawal symptoms. (*Id*. at 13.)

At 1:50 p.m. that day, Nurse Deese performed Bellamy's CIWA withdrawal as-
sessment. (*Id*. at 23.) She took his vital signs and noted that he was experiencing
anxiety and headaches, giving him a total withdrawal score of two out of sixty-seven.
(*Id*.) Nurse Deese recorded that Bellamy responded "no" to the following questions:
"(1) expresses thoughts about self-harm?; (2) does patient report a negative
visit/phone call with family/friends since last nursing encounter?; (3) does patient re-
port a negative outcome from court/video court since last nursing encounter?; and (4)
expresses feelings there is nothing to look forward to (feelings of hopelessness/help-

lessness)?" (*Id.*)  Nurse Deese then performed Bellamy's COWS withdrawal assessment.  (*Id.* at 28.)  She reported that Bellamy was experiencing restlessness, anxiety/irritability, and bone/joint aches, for a total withdrawal score of three out of forty-eight.  (*Id.*)  Nurse Deese again asked Bellamy the above behavioral health questions, and Bellamy answered "no" to all four.  (*Id.*)  At 2:37 p.m., Nurse Deese gave Bellamy Loperamide.  (Deese Aff. ¶ 3, ECF No. 116-2.)

At 5:00 p.m., Nurse Jennifer Rivera administered Librium to Bellamy.  (Bellamy Medical Records, ECF No. 116-4 at 19.)  At 6:20 p.m., Nurse Tracy Roberts performed another CIWA assessment on Bellamy.  (*Id.* at 23.)  She reported that Bellamy was experiencing nausea/vomiting, tremors and anxiety, for a total withdrawal score of three out of sixty-seven.  (*Id.*)  Nurse Roberts asked Bellamy the four behavioral health questions and he answered "no" to each of them.  (*Id.*)  Nurse Roberts then performed the COWS assessment on Bellamy and reported he was experiencing an elevated resting pulse rate, tremors, GI upset, restlessness, and bone/joint aches, giving him a total withdrawal score of five out of forty-eight.  (*Id.* at 28.)  She again asked him the four behavioral health questions and answered "no" to each of them.  (*Id.*)  At 6:30 p.m., Nurse Rivera administered Tylenol and Loperamide to Bellamy.  (*Id.* at 19.)

At 10:01 p.m. Nurse Wischmeyer performed Bellamy's CIWA assessment and reported Bellamy was suffering from nausea/vomiting, tremors, paroxysmal sweating, and anxiety, for a withdrawal score of six out of sixty-seven.  (*Id.* at 9.)  He answered "no" to the four behavioral health questions.  (*Id.*)  At 11:01 p.m., Nurse Wischmeyer

performs Bellamy's COWS assessment. (*Id.* at 10.)  She reported that he was suffering from an elevated resting pulse rate, tremors, GI upset, restlessness, and anxiety/irritability. (*Id.*)  Bellamy's withdrawal score was a six out of forty-eight. (*Id.*) He answered "no" to the four behavioral health questions. (*Id.*)

### C. Bellamy's Second Day in Jail—September 25, 2016

On September 25, 2016, at 1:00 a.m., a nurse[1] performed Bellamy's CIWA assessment, reporting that he suffered from nausea/vomiting, and giving him a withdrawal score of one out of sixty-seven. (*Id.* at 9.)  Bellamy answered "no" to the four behavioral health questions. (*Id.*)  Shortly after, Nurse Shawnte Wims administered Librium to Bellamy. (*Id.* at 19.)  At 1:06 a.m., Nurse Wischmeyer performed Bellamy's COWS assessment. (*Id.* at 10.)  Bellamy suffered from sweating, GI upset, and restlessness and received a withdrawal score of four out of forty-eight. (*Id.*)  He answered "no" to the four behavioral health questions. (*Id.*)  At 1:21 a.m., Nurse Wims administered Tylenol to Bellamy. (*Id.* at 19.)  At 9:00 a.m., Nurse Lauren Kannaple administered Librium to Bellamy. (*Id.*)  A nurse[2] also performed Bellamy's CIWA assessment at 9:00 a.m. (*Id.* at 23.)  Bellamy suffered from nausea/vomiting and anxiety and was given a total withdrawal score of two out of sixty-seven. (*Id.*)  Bellamy answered "no" to the four behavioral health questions. (*Id.*)  At 5:00 p.m., Nurse Tiwanna Lee administered Bellamy Librium. (*Id.* at 19.)

---

[1] The record does not reveal which nurse performed this assessment.
[2] The record does not reveal which nurse performed this assessment.

*D. Bellamy's Third Day in Jail—September 26, 2016*

On September 26, 2016, at 1:00 a.m., Nurse Amber Stephanoff administered Librium to Bellamy. (*Id*.) At 1:22 a.m., a nurse[3] performed Bellamy's CIWA assessment. (*Id*. at 23.) The nurse reported that Bellamy was suffering from nausea/vomiting, paroxysmal sweating, and headaches/fullness in head. (*Id*.) Bellamy answered "no" to the four behavioral health questions. (*Id*.) At 1:23 a.m., Nurse Stephanoff gave Bellamy Tylenol and Loperamide. (*Id*. at 19.) At 9:00 a.m., Nurse Martha Tunstill gave Bellamy Librium. (*Id*.) At 9:10 a.m., a nurse performed Bellamy's CIWA assessment. (*Id*. at 23.) Bellamy did not suffer from any withdrawal symptoms and was given a withdrawal score of zero out of sixty-seven. (*Id*.) Bellamy answered "no" to the four behavioral health questions.

*E. Bellamy's Suicide*

At 3:18 p.m., Bellamy opened the door to his cell and placed a blanket over the door, blocking the window and preventing anyone from seeing inside his cell. (Jail Video, ECF No. 123 at 15:18:17-15:18:56). Inmates are not permitted to have their windows covered. (Westmoreland Dep. 18:11-13, ECF No. 119-3.) If an officer sees an inmate's window is covered, he or she is to direct the inmate to take it down or take it down themselves. (*Id*. at 18:16-21.) Inmates usually cover their cell windows to use the restroom, block out light or sound, hide contraband, or attempt to harm themselves. (*Id*. at 19:9-13; Gordy Dep. 23:16—24:5, ECF No. 119-5.)

---

[3] The record does not reveal which nurse performed this assessment.

At 3:34 p.m., Deputies Westmoreland and Gordy performed a clock round in Bellamy's unit. (Jail Video, ECF No. 123, at 15:34:46.) Deputy Westmoreland does not remember seeing any windows covered during his clock round and did not notice the blanket on Bellamy's cell door. (*Id*. at 18:8-10; 20:14-15.) Neither Deputy Westmoreland nor Gordy removed the blanket from Bellamy's cell door during the clock round. (Jail Video, ECF No. 123 at 15:34:46-35:48.) Deputies Westmoreland and Gordy have not seen a deputy intentionally ignore a blanket covering a cell door. (Westmoreland Dep. 18:22-25, ECF No. 119-3; Gordy Dep at 23:3-15, ECF No. 119-5.) While conducting clock rounds, the deputies keep their "heads on a swivel," because there are inmates moving around the cell block at all times. (Westmoreland Dep. 20:17-25, 21:1-16, ECF No. 119-3.)

At 4:01 p.m., an inmate knocked on Bellamy's cell door. (Jail Video, ECF No. 123 at 16:01:57.) Approximately twenty seconds later, another inmate walked over, opened Bellamy's cell door, and discovered Bellamy's body hanging from a bedsheet. (*Id*. at 16:02:15-16:02:27.) The other inmates in the cell block gathered around Bellamy's cell and looked inside. (*Id*. at 16:02:19-16:03:06.) The inmates then appeared to be knocking on the walls to alert the jail staff of the incident. (*Id*.) Deputies Gordy, Westmoreland, and Felicia Clark entered the cell block area at 4:03 p.m. (*Id*. at 16:03:06-16:03:12.) Deputies Gordy and Westmoreland entered Bellamy's cell while Deputy Clark closed the cell door behind them and remained outside. (*Id*. at 16:03:12-16:03:26.)

When Deputies Westmoreland and Gordy entered the cell, they first attempted to untie the bedsheet from Bellamy's neck and get him down from the bed. (Westmoreland Dep. 30:7-13, ECF No. 119-3; Gordy Dep. 49:4-9, ECF No. 119-5.) The bedsheet was "really tight" around his neck, so they instead untied the knot from the top bunk, causing Bellamy to slide down onto the lower bunk. (Gordy Dep. 49:4-9; 49:21—50:7, ECF No. 119-5.) Deputy Gordy stated: "Once we got him down I noticed right then that he was dead, because he wasn't moving, there was like no breathing, no struggle, his face was blue, lips was [sic] purple." (*Id*. at 50:21-25.) Deputy Gordy radioed for additional assistance sometime between seeing Bellamy hanging from the bed and attempting to untie the bedsheet from his neck. (*Id*. at 49:21—50:7; 50:10-13.) Deputy Gordy did not take Bellamy's pulse nor did he check to see if Bellamy was breathing. (*Id*. at 49:10-15; 51:6-13.) Deputy Westmoreland does not remember if he provided first aid care to Bellamy, checked for a pulse, or checked to see if he was breathing. (Westmoreland Dep. 31:19-25, ECF No. 119-3.) Neither Deputy Westmoreland nor Deputy Gordy obtained a "cut down knife," a tool the Jail keeps in an emergency box to cut down suicidal inmates. (*Id*. at 31:1-8; Gordy Dep. 61:3-18, ECF No. 119-5.) Deputy Gordy did not know where the cut down knife was on the day Bellamy hanged himself. (Gordy Dep. 61:11-13; ECF No. 119-5.) When asked if he had access to the knife on that day, Deputy Gordy responded: "I don't recall. I don't think so. Maybe. I don't know." (*Id*. at 61:14-18.) Deputy Westmoreland was not sure if there was a knife on the floor they were on, but stated, "we didn't have one

to use that day." (Westmoreland Dep. 31:1-4; ECF No. 119-3.)  Deputy Westmoreland did not think about attempting to find a knife to cut down Bellamy.  (*Id.* at 31:5-8.)

A few seconds later, Deputies Westmoreland and Clark ran out of the cell and cell block to get assistance.  (Jail Video, ECF No. 123 at 16:03:37-16:03:44; Westmoreland Dep. 30:7-13, ECF No. 119-3.)  Deputy Gordy began locking up the other inmates in the cell block.  (Jail Video, ECF No. 123 at 16:04:04-16:05:07.)  At this point, no one had attempted to perform CPR on Bellamy.  (Gordy Dep. 49:18-19, 52:11-13, ECF No. 119-5.)  At 4:07 p.m., additional deputies entered Bellamy's cell and were able to untie the bedsheet from his neck and began performing CPR.  (*Id.* at 16:07:03.)  Two minutes later, three CCS employees and one other deputy arrived on the scene.  (*Id.* at 16:09:46.)  Jail and CCS staff moved Bellamy outside of his cell and continued performing CPR.  (*Id.* at 16:16:15.)  The Indianapolis Fire Department arrived on the scene at 4:17 p.m.  (*Id.* at 16:17:35.)  The Fire Department's report indicated that Bellamy was asystole (had no heartbeat) and stayed asystole for the entire thirty minutes that CPR was performed.  (IFD Report, ECF No. 119-14 at 3.)  CPR was performed in shifts by medical staff until 4:44 p.m.  (Jail Video, ECF No. 123 at 16:17:35-16:44:35.)  Bellamy was declared dead at 4:44 p.m.  (Coroner's Report, ECF No. 119-16 at 3.)

### F. Medical Opinions

Dr. Mirfrida Geller performed the autopsy on Bellamy.  (Bellamy Autopsy, ECF No. 119-15 at 1.)  She concluded that his cause of death was asphyxia due to hanging

and the manner of death was suicide.  (*Id*.)  Dr. Geller concluded that because Bellamy was found in his cell sitting on the floor with a ligature mark on his neck, had no pulse, and was apneic, he was already dead when the jail staff discovered him. (Geller Dep. 21:20—22:4, ECF No. 119-16.)  Dr. Geller testified that it takes about 15 to 20 seconds for a person to die from asphyxia due to hanging.  (*Id*. at 41:22—42:3; 42:10-21; 43:1-17; 44:6-20.)  After someone has hung themselves, it is very difficult to get them back to a normal state because so much damage has already been done to the brain tissue.  (*Id*. at 45:21—46:7.)  Dr. Geller had cases such as Bellamy's when she worked in a hospital, and she testified that even when patients who had hanged themselves were brought in, they still died after medical treatment.  (*Id*. at 46:16-21.)

Dr. Edward Bartkus, an Emergency Medicine physician, was retained by Defendants to offer his expert opinion on Bellamy's death.  (*See* Bartkus Report, ECF No. 119-17.)  Dr. Bartkus reviewed the video evidence, autopsy and incident reports, and depositions of the deputies, as well as various medical literature.  (*Id*. at 4, 10-11.) Dr. Bartkus opines that Bellamy was "unresuscitatable" by the time the Jail staff arrived on the scene.  (*Id*. at 8.)  He further concluded that "[t]he three minute, 36 second lapse between the first set of deputies who found him, and the second set of deputies who began CPR was certainly not the cause of his death.  Provision of CPR upon arrival of the first deputies is extremely unlikely to have changed the outcome, and can in no way be seen as the proximate cause of his death."  (*Id*.)

Dr. Stephen Ross, a licensed clinical psychologist, offered his expert opinion on CCS's mental health and suicide screening.  (*See* Ross Aff., ECF No. 116-4.)  Dr. Ross

12

reviewed Bellamy's medical records from his incarceration at the Jail in September 2016, including the screening questionnaires and the withdrawal protocol sheets, and concluded, to a reasonable degree of medical certainty that "the mental health and suicide screening used by Nurse Jennifer Deese upon Mr. Bellamy's intake into the jail was reasonable, appropriate, and within the applicable standard of care for mental health and suicide screening in the state of Indiana." (*Id.* ¶¶ 4-5.) Dr. Ross further opined that Bellamy did not present any information during his intake that warranted placing him on suicide watch, and drug and alcohol withdrawal is not itself a reason to place an individual on suicide watch. (*Id.*) The monitoring tools and protocols used by the medical staff to monitor Bellamy's mental health during his withdrawal, in Dr. Ross's opinion, were "reasonable, appropriate, and within the standard of care." (*Id.*)

### G. Marion County Internal Investigation

The Marion County Sheriff's Department conducted an internal investigation into Bellamy's death. (IA Report, ECF No. 134-3.) Deputy Westmoreland was suspended for one day and required to undergo remedial training for violating Rule 253: Performance of Duty–Efficiency. (*Id.*) Rule 253 provides: "Every Sheriff's Deputy shall perform their duty in a manner which shall maintain satisfactory standards of efficiency while carrying out the objectives of the Department." (*Id.*) Deputy Westmoreland violated this rule by: (1) walking past Bellamy's cell during the clock round and not investigating why the blanket was there and (2) leaving Bellamy's cell after

discovering him hanging from the bed, thus leaving him without medical attention. (*Id.*)

### H. Bellamy's Estate

Plaintiff Vale-Gugliuzzi is Bellamy's maternal aunt and the personal representative of his estate.  (David Bellamy Aff. ¶ 4, ECF No. 116-5.)  Bellamy's father, David Bellamy, is opposed to the filing of this lawsuit by Vale-Gugliuizzi, and although he is the beneficiary of this action, he does not wish to benefit from it.  (*Id.* ¶ 6.)

## II.    Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party," *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017), but the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

14

### III.   Discussion

*A. Medical Defendants*

Vale-Gugliuizzi brings claims against Nurse Deese for "deliberate indifference" under the "Fourth, Eighth, and/or Fourteenth Amendment" (Count VIII).  Against CCS, Vale-Gugliuzzi alleges violations of 42 U.S.C. § 1983 under a *Monell* theory of liability (Counts I & II).

1. <u>Deliberate Indifference Claim Against Nurse Deese</u>

Defendants argue that Vale-Gugliuzzi's claim against Nurse Deese arises under the Fourth Amendment because Bellamy's injury occurred after a warrantless arrest but before a probable-cause determination, meaning the "objectively unreasonable" standard would apply to Deese's actions.  Vale-Gugliuzzi, on the other hand, classifies Bellamy as a "pretrial detainee" and analyzes her claim under the Fourteenth Amendment Due Process Clause, applying the "deliberate indifference" standard.

Most claims for inadequate medical care involve inmates incarcerated after conviction.  Such claims arise under the Eighth Amendment's Cruel and Unusual Punishment Clause.  *See Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).  But because pre-trial detainees cannot be punished under the Eighth Amendment, *id*. at 910, the Fourteenth Amendment Due Process Clause governs the period of confinement after the judicial determination of probable cause and before conviction.  *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("The judicial determination of probable cause may be made before the arrest (in the form of an arrest warrant) or promptly after the arrest, at a probable cause hearing[.]).  The Fourth Amendment, however,

protects inmates who have been seized and detained without a warrant and who have not yet gone before a judge for a probable cause hearing.  *Id.*  The record reveals that Bellamy was arrested on September 24, 2016 *with* a warrant.  (Bellamy OMS Records, ECF No. 119-10.)  Therefore, the Fourteenth Amendment applies to Vale-Gugliuizzi's claim.

In the past, courts assessed pretrial detainees medical care claims under the Eighth Amendment's deliberate indifference standard, reasoning that "the Due Process Clause of the Fourteenth Amendment imposes at least as robust a duty on government custodians."  *Daniel v. Cook Cty.,* 833 F.3d 728, 733 (7th Cir. 2016) (citing *Rice v. Correctional Medical Services*, 675 F.3d 650, 664 (7th Cir. 2012)).  The Eighth Amendment deliberate indifference standard requires (1) a substantial risk of serious harm that (2) the government official subjectively knew of and deliberately ignored. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

However, the Supreme Court recently clarified, in the excessive-force context, that a pretrial detainee does not need to prove that the defendant was subjectively aware that the amount of force being used was unreasonable.  *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2472-73 (2015).  Rather, the plaintiff needed only to show that the defendant's conduct was objectively unreasonable.  *Id.*  Recognizing "that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees," the Seventh Circuit extended *Kingsley* to pretrial detainee's claims of inadequate medical care.  *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *see also Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019).

16

Thus, after *Miranda*, the inquiry for evaluating a pretrial detainee's due process challenge to his medical care is twofold. *See McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018). The first step "asks whether to medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* (quoting *Miranda*, 900 F.3d at 353). Neither a showing of negligence nor gross negligence will suffice. *Id.* The second step asks whether the conduct was objectively reasonable. *Miranda*, 900 F.3d at 354. Courts must look to "the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and . . . gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886.

With this framework in mind, the Court turns to the facts at hand. Nurse Deese argues that no reasonable juror could find that the treatment she provided to Bellamy was objectively unreasonable, because she elicited all the information Bellamy would provide regarding his current and former medical needs, she placed him on the proper drug withdrawal protocols, and while performing Bellamy's first CIWA and COWS assessments, she asked him the four questions about his mental health and he responded "no" to each. Vale-Gugliuizzi responds, noting that Nurse Deese, on Bellamy's "Suicide Potential Screening," marked "no" as to whether Bellamy was showing signs of withdrawal or mental illness, yet later that day, on Bellamy's "Withdrawal Score Sheet," indicated that Bellamy was exhibiting symptoms of withdrawal, including nausea, vomiting, tremors, anxiety, and headaches. Vale-Gugliuizzi argues that

17

this evidence raises a question of material fact as to whether Nurse Deese was sub-jectively aware that Bellamy had a serious risk of medical emergency. Nurse Deese replies that during the Receiving Screening she did not observe any obvious signs that Bellamy had withdrawal symptoms, but that during her actual assessment of him, when she filled out the Withdrawal Scoresheet, she was able to lay hands on him and talk to him in more depth, which resulted in Bellamy reporting minor symp-toms.

Construing the facts in Vale-Gugliuzzi's favor, the record contains no evidence that Nurse Deese acted purposefully, knowingly, or recklessly when considering the consequences of caring for Bellamy. In performing Bellamy's Receiving Screening, Nurse Deese asked Bellamy about his past physical and mental health conditions and Bellamy reported no problems. Nurse Deese also asked Bellamy the suicide questions listed on the Receiving Screening. Bellamy responded "no" to every question, includ-ing whether he had a psychiatric history, had previously attempted suicide, showed signs of depression, or was expressing any suicidal thoughts. Nurse Deese noted on the form that Bellamy was in the process of withdrawing from Xanax and heroin and properly placed him in the CIWA and COWS protocols so that he would receive addi-tional monitoring and medication to address withdrawal symptoms. During the Re-ceiving Screening, Nurse Deese noted that Bellamy was not currently exhibiting signs of withdrawal. Nurse Deese then performed Bellamy's initial CIWA and COWS assessments, concluding that he had minimal withdrawal symptoms (giving him a 2/67 score on the CIWA assessment and a 3/48 on the COWS assessment). Following

completion of the Receiving Screening and the first CIWA and COWS, Nurse Deese had no further involvement in Bellamy's care.

The fact that Nurse Deese answered "no" to the question of whether Bellamy was showing symptoms of withdrawal on his Receiving Screening, and then reported that Bellamy was suffering mild symptoms during the CIWA and COWS assessment, does not render her care reckless.  The Receiving Screening asks: "is individual incoherent or *showing* signs of withdrawal or mental illness?"  The CIWA and COWS assessments revealed that Bellamy was suffering from anxiety, headaches, restlessness, and bone aches.  Aside from restlessness, the remaining complaints (signs of anxiety, headaches, and bone aches) do not manifest themselves in an obvious physical manner.  Nurse Deese would not have been able to become aware of these symptoms until she performed the CIWA and COWS protocols, in which Bellamy himself reported the symptoms.  And even if Nurse Deese failed to notice any obvious symptoms Bellamy was experiencing during the Receiving Screening, she was able to discover them that same day while performing the CIWA and COWS protocols.

Nurse Deese's conduct was also objectively reasonable.  Vale-Gugliuzzi argues that Nurse Deese was "subjectively aware" that Bellamy had a serious risk of medical emergency because she ignored the results of the tests administered to Bellamy and failed to place him on suicide watch.  However, under the Fourteenth Amendment standard, courts do not evaluate the subjective belief held by the individual providing care.  *See McCann*, 909 F.3d at 886.  When Nurse Deese performed Bellamy's CIWA

and COWS assessments, the results showed that he was experiencing only mild with-drawal symptoms.  It was objectively reasonable for Nurse Deese not to place Bellamy on suicide watch due to the mere fact that he was suffering from mild Xanax and heroin withdrawal symptoms, confirmed by Dr. Ross' expert opinion, that Bellamy did not present any information during his intake that warranted placing him on suicide watch, and drug and alcohol withdrawal is not itself a reason to place an in-dividual on suicide watch.  In fact, the record contains no expert testimony that Bel-lamy should have been placed on suicide watch.  It was also objectively reasonable for Nurse Deese to use the standard Receiving Screening form and to rely on the medical information Bellamy provided to her in determining whether to place him on suicide watch.  Bellamy's decision not to share his feelings of self-harm, if they even existed at that time, with Nurse Deese cannot be held against her.  Nurse Deese fol-lowed the proper procedure by placing Bellamy in CIWA and COWS protocols so his withdrawal symptoms could be monitored.  *See Jones v. Forestal*, No. 1:18-CV-01987-SEB-DLP, 2020 WL 1469832, at *16 (S.D. Ind. Mar. 26, 2020) (holding a CCS Nurse's decision not to place a Marion County inmate on suicide watch was objectively rea-sonable, despite knowing the inmate had a mental health history and was actively withdrawing from drugs and alcohol, because the Nurse properly placed the inmate in CIWA and COWS protocols and because the inmate answered "no" to all suicide screening and behavioral health questions.)

Vale-Gugliuzzi has failed to demonstrate a genuine issue of material fact regarding whether, "despite the persistent and reasoned medical attention given to [Bellamy], he was provided with objectively unreasonable medical care." *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019). Accordingly, Nurse Deese is entitled to summary judgment.

2. *Monell* Claim Against CCS

Vale-Gugliuzzi argues that CCS maintained a custom, policy, and practice that failed to provide Bellamy with suicide preventative care. Specifically, she argues that (1) CCS's policies and procedures failed to recognize and prevent inmate suicide in general population and that (2) CCS failed to train its medical employees to respond to medical emergencies.

An official acting under color of state law may be held liable under § 1983 if he "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A private corporation that provides essential government services, such as CCS, acts under color of state law. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). To be held liable, "the official's act must both be the cause-in-fact of the injury and its proximate cause." *Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012)).

The critical question under *Monell* is whether a municipal (or corporate) policy or custom gave rise to the harm, or if instead the harm resulted from the acts of the

entity's agents.  *Glisson,* 849 F.3d at 379.  In order to prove a *Monell* violation Vale-Gugliuzzi must show that (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or that (3) an allegation that the constitutional injury was caused by a person with final policy making authority.  *Id.*

### a.  Failure to Prevent Inmate Suicide

In support of her claim against CCS, Vale-Gugliuzzi argues that CCS's suicide risk reduction program is inadequate to prevent inmate suicide but does not cite to any evidence corroborating her assertion.  Vale-Gugliuzzi contends that CCS's procedures to care for suicidal inmates are based largely on "self-reporting, which [are] inadequate when dealing with suicidal inmates, especially those who are assigned to general population, such as Mr. Bellamy."  However, the uncontroverted expert testimony of Dr. Ross is that the Receiving Screening form and the CIWA and COWS protocols in use at the jail are appropriate and reasonable screening tools to assess suicide risk and address drug and alcohol withdrawal.  Vale-Gugliuzzi has not refuted this testimony nor offered any expert testimony of her own.

Vale-Gugliuzzi also argues that CCS's suicide risk reduction program does not contain drug withdrawal as a sign or symptom of suicidal ideation.  Vale-Gugliuzzi offers no evidence that drug withdrawal symptoms are in fact signs of suicidal ideation.  And the only evidence in the record refutes this contention.  Dr. Ross testified that drug withdrawal alone is not reason enough to place someone on suicide watch.

Further, CCS's drug withdrawal programs, CIWA and COWS, both contain a behavior health section in which the nurse asks the patients four questions concerning their mental health. Thus, even if Vale-Gugliuzzi presented evidence that drug withdrawal is a symptom of suicidal ideation, CCS's standard drug withdrawal protocols appropriately address and asses an inmate's suicide risk.

Vale-Gugliuzzi has not presented any evidence that CCS maintained a custom, policy, and/or practice that failed to provide Bellamy with suicide preventative care. Therefore, CCS is entitled to summary judgment on Vale-Gugliuzzi's first *Monell* claim.

### b.  Failure to Train Medical Employees

"A failure-to-train claim is actionable only if the failure amounted to deliberate indifference to the rights of others." *Miranda*, 900 F.3d at 345. "Deliberate indifference exists where the defendant (1) failed 'to provide adequate training in light of foreseeable consequences'; or (2) failed 'to act in response to repeated complaints of constitutional violations by its officers.'" *Id.* (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006)).

Vale-Gugliuzzi argues that CCS failed to train its employees to properly identify potentially suicidal inmates. Specifically, she alleges that Nurse Deese failed to report Bellamy's suicidal tendencies and underreported his symptoms of withdrawal. Vale-Gugliuzzi cites to Bellamy's Withdrawal Score Sheets to argue that Nurse Deese and CCS staff were presented with Bellamy's "severe and intensifying symptoms of

detoxification and withdrawal" yet did not place him on suicide watch or "otherwise provide him with adequate care for these obvious symptoms."

However, there can be no liability under *Monell* for failure to train when the plaintiff has failed to demonstrate any constitutional violation by an employee. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir.2007) (citing *Alexander v. City of South Bend,* 433 F.3d 550, 557 (7th Cir.2006)). The record does not support a finding that any constitutional violation occurred. Because no constitutional violations occurred, no liability can be imposed on CCS. For at least this reason, CCS is entitled to summary judgment on Vale-Gugliuzzi's second *Monell* claim.

### B. County Defendants

Vale-Gugliuizzi brings claims against the Sheriff for violations of 42 U.S.C. § 1983 under a *Monell* theory of liability (Counts I & II). Against the individual deputies, Vale-Gugliuzzi alleges claims of "failure to protect" (Count VI) and "deliberate indifference" (Count VII) under the "Fourth, Eighth, and/or Fourteenth Amendments."

### 1. Fourteenth Amendment Claims Against Deputies

Vale-Gugliuzzi first claims that Deputy Westmoreland acted objectively unreasonably by failing to remove the blanket from Bellamy's cell. She also claims all the deputies acted objectively unreasonably by failing to untie the sheet from Bellamy's neck, failing to provide him with emergency medical services, and leaving him alone in his cell without medical attention.

The deputies argue that their actions were not objectively unreasonable, and even if they were, that they are entitled to qualified immunity. "Qualified immunity

shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted). "A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)) (quotation marks omitted). To be "clearly established," a right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right[.]" *Id.* at 351 (citations and quotation marks omitted).

The plaintiff bears the burden of defeating the qualified immunity claim. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). Plaintiffs can defeat qualified immunity by "identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013). While plaintiffs need not point "to an identical case finding the alleged violation unlawful . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp*, 877 F.3d at 351 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308, (2015)) (quotation marks omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018).

Courts have discretion to find immunity exists on the basis that the right was not clearly established, without determining whether there was a violation in the first place. *Abbott*, 705 F.3d at 713 (citing *Pearson v. Callahan,* 555 U.S. 223, 227 (2009)). Because the issue of qualified immunity is dispositive, the Court addresses it without determining whether the deputies violated Bellamy's constitutional rights.

The deputies acknowledge that there is a general right under the Due Process Clause for pretrial detainees to receive care to reduce the chance of suicide and that known suicide risks must be monitored by Jail staff to some extent, but argue that application of that right in the context of this case does not demonstrate violation of clearly established law. Vale-Gugliuzzi has not met her burden to show that no reasonable officer in the deputies' positions could have thought they were acting lawfully. Plaintiff cites *Helling v. McKinney,* 509 U.S. 25 (1993) and states that "[i]n terms of an individual's serious medical needs, a deliberate refusal to treat is an obvious violation of the Eighth Amendment." In *Helling*, the Supreme Court held that a prisoner who was involuntarily exposed to tobacco smoke from other inmates' cigarettes, which posed an unreasonable, yet not immediate, risk to his health, had stated a claim on which relief could be granted for a violation of his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* at 35.

The *Helling* decision cited by Vale-Gugliuzzi would not provide notice to the deputies that failing to remove a blanket from an inmate's door or unsuccessfully attempting to untie a bedsheet from an unconscious inmate's neck would violate clearly established law. The Supreme Court has "repeatedly told courts . . . not to define

clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Lovett*, 907 F.3d at 992 (quoting *Mullenix*, 136 S.Ct. at 308) (emphasis in original). Specificity is important because it can be difficult for an officer to determine how the relevant doctrine will apply to the factual situation at hand. *Id. Helling* merely stands for the proposition that the Eighth Amendment protects against the risk of future harm to inmates. 509 U.S. at 33. This decision is not factually analogous to case at hand, nor does it involve the same constitutional amendment. That prison officials may violate the Eighth Amendment by exposing inmates to tobacco smoke does not put any of the Jail's deputies on notice that their actions surrounding Bellamy's suicide would violate clearly established law.

The deputies are therefore entitled to qualified immunity and the Court need not address whether their actions violated Bellamy's constitutional rights. Summary judgment is appropriate and granted as to Vale-Gugliuzzi's Fourteenth Amendment claims against the deputies.

### 2. *Monell* Claims Against Sheriff

Vale-Gugliuzzi alleges that the Sheriff maintains a pattern or practice of displaying deliberate indifference to inmate medical needs by failing to train deputies to: (1) identify an inmate's risk of suicide; and (2) provide first aid in emergency situations like the one the deputies confronted with Bellamy.

Although the individual deputies are entitled to qualified immunity, Vale-Gugliuzzi may still prevail on a "failure to train" *Monell* claim against the Sheriff, as a

jury could conclude that the deputies violated Bellamy's rights even though the deputies are not liable for the violations based on the defense of qualified immunity. Thus, Vale-Gugliuzzi can still argue that the Sheriff's policies caused the harm, even if the officers were not individually liable. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 304 (7th Cir. 2010). The Court, therefore, will first address whether a reasonable juror could determine that the deputies violated Bellamy's due process rights before evaluating Vale-Gugliuzzi's *Monell* claims.

### a. Deputy Westmoreland's Failure to Remove the Blanket

As stated above, a pretrial detainee's due process claims are assessed under an "objectively unreasonable" standard. *See McCann*, 909 at 886. Vale-Gugliuzzi must prove that Westmoreland acted purposefully, knowingly, or recklessly in disregarding Bellamy's risk of suicide and that this action was objectively unreasonable. Defendants argue that Deputy Westmoreland did not intentionally ignore the blanket covering Bellamy's door and the mere fact that Bellamy had hung a blanket over his door was not sufficient to put Deputy Westmoreland on notice that Bellamy was considering suicide. Vale-Gugliuzzi argues that a jury could find that a constitutional violation occurred because Deputy Westmoreland violated MCSO policy by not removing the blanket.

The evidence does not establish that Deputy Westmoreland's conduct, failing to remove the blanket, was a purposeful, knowing, or reckless disregard of the fact that Bellamy was contemplating suicide. None of the CCS or Jail staff, including Deputy

28

Westmoreland, were on notice that Bellamy was at risk of committing suicide. Bellamy was asked over a dozen times during the course of his three days at the Jail whether he was experiencing suicidal ideations, and each timed he responded "no." Further, the fact that Bellamy placed a blanket over his cell was not enough to alert Deputy Westmoreland that Bellamy could be attempting suicide. Although inmates sometimes place blankets over their cells in an attempt to harm themselves, they also do so when using the restroom, to block out light and sound, and to hide contraband. While Deputy Westmoreland's action may have been negligent, there is no evidence that he deliberately chose to ignore the blanket over Bellamy's door, knowing that he was at risk of committing suicide. *Compare Miranda*, 900 F.3d at 354 (reversing the grant of summary judgment against jail medical staff who did not transport pretrial detainee to the hospital despite her being on suicide watch and refusing to eat or drink for several days) *with McKinney v. Franklin Cty., Illinois*, 417 F. Supp. 3d 1125, 1139 (S.D. Ill. 2019) (jail officials who knew juvenile pretrial detainee was upset during intake, cried on several occasions, expressed concerns about his behavioral level, and had a mental health evaluation four months prior were not put on notice of juvenile's suicide risk).

Deputy Westmoreland's actions were not objectively unreasonable. Although failing to remove the blanket from Bellamy's door violated MCSO policy, this fact alone is not sufficient to establish a constitutional violation. *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006) (concluding that "police rules, practices and regula-

tions" are "an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct").  Deputy Westmoreland testified that he failed to notice the blanket over Bellamy's door and that he did not look into Bellamy's cell because he was looking around the cell block and keeping his head "on a swivel."  He explained that during a clock round, there are inmates in the cell block moving around at all times, and that some of them will run up to officers and ask a question or express a grievance, so the officers had to be constantly looking around the block.  It is not objectively unreasonable that Deputy Westmoreland missed the blanket hanging over Bellamy's cell while he was attempting to secure the entire cell block.  Again, while Deputy Westmoreland may have acted negligently, a showing of negligence alone does not rise to the level of a constitutional violation.  *See Miranda*, 900 F.3d at 353.

Deputy Westmoreland did not purposefully, knowingly, or recklessly disregard Bellamy's risk of committing suicide and his actions were not objectively unreasonable.  Therefore, he did not violate Bellamy's due process rights.

### b. Deputies' Failure to Adequately Provide Emergency Medical Services

Vale-Gugliuzzi next alleges that the deputies violated Bellamy's due process rights when they were unable to untie the bedsheet from his neck, failed to provide him with emergency medical services, and left him alone in his cell without medical attention.  Defendants argue that the delay in removing the bedsheet was not a cause in fact of Bellamy's death, and that the deputies did not have a purposeful, knowing, or reckless disregard for Bellamy's safety.

Section 1983 imposes liability on an official who "subjects, or *causes to be sub-jected,* any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012); 42 U.S.C. § 1983 (emphasis in opinion). "This provision must be read against the background of tort liability[,]" which requires that the act be the "'cause-in-fact' of the injury, i.e., the injury would not have occurred absent the conduct[.]" *Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). To withstand summary judgment, Vale-Gugliuzzi must present "verifying medical evidence that the delay in medical care caused some degree of harm." *Miranda*, 900 F.3d at 347 (internal quotations and citations omit-ted). Vale-Gugliuzzi has not, however, submitted any evidence showing that Bellamy could have survived had the bedsheet been removed from his neck sooner. In fact, all the evidence supports the conclusion that Bellamy was unresuscitatable at least by the time he was discovered by the deputies.

Both Dr. Geller and Dr. Bartkus opined that Bellamy had already died when the jail staff arrived on the scene. Dr. Bartkus further concluded that the "lapse between the first set of deputies who found him, and the second set of deputies who began CPR was certainly not the cause of his death" and that "[p]rovision of CPR upon arrival of the first deputies is extremely unlikely to have changed the outcome[.]" The Fire Department also reported that Bellamy was asystole (had no heartbeat) for the entire thirty minutes that CPR was performed. Lastly, Deputy Gordy testified that once they lowered Bellamy down to the lower bunk, he "noticed right then that he was

dead, because he wasn't moving, there was like no breathing, no struggle, his face was blue, lips was [sic] purple." Vale-Gugliuzzi has not submitted any evidence to contradict these findings nor support her assertions that untying the bedsheet from Bellamy's neck sooner would have resulted in a different outcome. *See Killian v. Concert Health Plan*, 742 F.3d 651, 695 (7th Cir. 2013) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). There is no evidence that Bellamy had a higher chance of survival had the deputies taken a different course of action, and therefore no constitutional violations have occurred. *See Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996) (finding no constitutional violation by jail officer who failed to obtain medical help for inmate because the one-hour delay did not cause the injury suffered by the inmate).

Because none of the deputies violated Bellamy's constitutional rights, there can be no liability under *Monell* for a failure to train claim against the Sheriff. *Jenkins*, 487 F.3d at 492 (citing *Alexander,* 433 F.3d at 557). Accordingly, the Sheriff is entitled to summary judgment on both of Vale-Gugliuzzi's *Monell* claims.

### C. State Law Claims Against All Defendants

Vale-Gugliuzzi also brings several state-law claims against the Sheriff and the individual deputies, including, wrongful death (Count III), a claim under Indiana's

Survival Act (Count IV), intentional infliction of emotional distress (Count IX), negligent infliction of emotional distress (Count X), and negligence (Count XI). She alleges a failure to train claim (Count V) against CCS.

The Court's jurisdiction in this case arises from Vale-Gugliuzzi's federal-law claims, with supplemental jurisdiction over the state-law claims authorized by 28 U.S.C. § 1367. Because all of Vale-Gugliuzzi's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over her state-law claims. "The general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998); *see also* 28 U.S.C. § 1367(c)(3).

Pursuant to § 1367(d), the limitations periods for those state-law claims have been tolled—i.e., the limitations clock has been stopped—for the pendency of this case and shall be tolled for an additional thirty days from the entry of this order, so Vale-Gugliuzzi will not be unduly prejudiced by dismissal. *See Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, i.e., to stop the clock."). Vale-Gugliuzzi's state-law claims are therefore **dismissed without prejudice** to filing them in the proper state court.

### IV.    Conclusion

For the reasons stated above, the Medical Defendants' Motion for Summary Judgment (ECF No. 115) is **granted**.  Counts I, II, and VIII are **dismissed with prejudice** on the merits.  Count V is **dismissed without prejudice** to filing in the proper state court.

The County Defendants' Motion for Summary Judgment (ECF No. 118) is **granted**.  Counts I, II, VI, and VII are **dismissed with prejudice** on the merits.  Counts III, IV, IX, X, and XI are **dismissed without prejudice** to filing in the proper state court.  A final judgment will be entered separately.

**SO ORDERED**.

Date:   6/29/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution via CM/ECF to all registered parties.